### NICHOLS v. UNITED STATES.
### No. 7227.

Circuit Court of Appeals, Ninth Circuit.
Jan. 24, 1934.

598

Clarence L. Hillman, of Rexburg, Idaho, and Hawley & Worthwine, Oscar W. Worthwine, and Jess Hawley, all of Boise, Idaho, for appellant.

John A. Carver, U. S. Atty., and E. H. Casterlin and Frank Griffin, Asst. U. S. Attys., and R. L. Slaughter, Atty., U. S. Department of Justice, all of Boise, Idaho, and Wilbur C. Pickett, Sp. Asst. to Atty. Gen.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

Plaintiff, the insured under a war risk insurance contract in the sum of $10,000, was wounded in action on November 10, 1918. A piece of high explosive shell struck him below the left eye and penetrated upward and backward, embedding itself in the left eyeball. Another piece of shell struck him in the left leg. First aid treatment was administered, he was hospitalized, returned to the United States, and honorably discharged. As a result of his wounds he is lamed, suffers some degree of deafness in the left ear, and a loss of sight in the left eye with drooping eyelid, being only able to distinguish light from dark. At his discharge he stated that the loss of his left eye would interfere with his prewar occupation of range rider, but this was the only disability noted. Following his discharge on March 13, 1919, at Camp Lewis, Wash., Nichols left for his home in Idaho. He rested en route, so that several days elapsed before he finally arrived home. He stayed at his father's ranch, attempting to ride and to assist generally, but his testimony is to the effect that he was unable to go forward with the work. Following this, he attempted mining with his father, in which endeavor he was unsuccessful. A few months later he secured work with an ore concentrator company, and was employed at this work for nearly half a year, where he testified that he missed about one-sixth of the time because he "couldn't stand the work." Upon leaving this employment, he returned to his father's ranch, where he occupied his time doing chores. Shortly thereafter he was married, and again attempted to do work on his father's farm, but the pain in his head and the dust made it impossible for him to pitch hay. In November of 1920, five months following his marriage, he secured work at a mine, which he held for about a month, missing about one-half of the time because of pains in his head and leg. Then follows about six months of vocational training in automobile mechanics. He testified that his sight was such that he could not study, and that his wife was forced to read the text-books to him. During this period he was undergoing treatment by a Veterans' Bureau doctor. At the close of the school year, June, 1921, he entered placement training, where he remained until September, when he returned home to assist his father, who had entered the sheep business. He states that his legs gave out, and' he was forced to spend his time doing the chores around the ranch. In the spring of 1922 he formed a partnership with a Mr. Allen in the automobile repair business. This continued until the spring of 1923, when he sold his interest to Allen, and with his wife went on to California, where they remained for about a year. He testified that he missed about one-fourth of the time while he was with Allen in business. He worked while in California, but states that he was "laid off" because he was unable to keep up with the other men. Another attempt at work was abandoned because unprofitable. Returning from California in June of 1924, he purchased a garage, and remained in that business until January of 1926, when financial difficulties beset him and he ceased operating. He returned to his father's place, where he again did chores for about three months. He then obtained employment in an automobile parts company, but continued only two weeks because he could not see well enough. Here he again complains of headache. Following this, he leased a gasoline station which he operated for a period of about four months (September, 1926), leaving because his creditors threatened attachment proceedings on bills previously contracted. Here, as usual, he missed time because of his condition. He did no work again until May of 1927, when an oil company leased him the service station which he had vacated the previous fall. He operated this station until August of 1928, having a hired man to do

most of the service work. This arrangement was abandoned when he was offered the distributing plant by the oil company, which he operated from July of 1928 to November of 1930, when a new commission contract was tendered by the company, which he refused to accept. The business is designated as "bulk distributing," and is somewhat similar to that of a wholesaler. He did not work until May of 1931, when he took over a bulk distribution plant for another oil company upon a similar arrangement, which he continued to operate up until the time of trial. These last two business ventures required considerable accounting and book work, which according to the testimony, was done by plaintiff's wife. It was also necessary for him to hire other help in the business.

Running through the testimony of the plaintiff is a regular and consistent complaint against headaches and an inability to see clearly without effort. His lameness is also noted, but with less emphasis.

Witnesses produced by plaintiff, Nichols, all testified to his obvious limp when walking, to his "drooping" eyelid, and to his somewhat defective hearing. Some testified that he complained of headaches. These headaches, according to the testimony of his wife, were quite severe, varying in duration from three or four hours to three or four days, following some particular eyestrain. She estimated that for quite a long time back on account of his condition he was away from his work about one-quarter of the time.

Three expert witnesses also offered testimony for the plaintiff, one, a Roentgenologist, presented X-ray pictures of his head, pointed out their significance to the jury, and testified as to insured's condition. Another expert was a general practitioner who had been Nichols' physician since 1926. He testified that plaintiff's chief complaint was persistent headaches, for relief from which he had applied to the witness, and which at that time were his only complaint; that he was not able to arrive at any definite cause for the condition; that during the time he treated plaintiff he showed evidence of suffering; that he personally knew him in the business he was trying to carry on; and that in his opinion plaintiff was not able to work continuously at that occupation on account of the headaches. The other expert witness was an eye, ear, nose, and throat specialist, who had made an examination of the plaintiff two days prior to the trial of the case. In answer to a long hypothetical question giving the history of the case, and in which was condensed practically all of the testimony offered in behalf of plaintiff, this specialist testified that he thought plaintiff was totally and permanently disabled at the time of his discharge from the United States Army on the 13th day of March, 1919, assuming the following definition of permanent and total disability: "Total disability is that condition of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation, and total disability shall be deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it."

On cross-examination this witness further testified: "My opinion as to his total and permanent disability is not wholly based on his headaches, but the fact that his eye tires and he complains of blurred vision after he has used his eyes for any length of time. I think that a man can carry on a business three-fourths of the time and be totally and permanently disabled from continuously doing the work. I think that a man who went to Leadore in a garage in 1922 until 1923, and was off one-fourth of the time with headaches was totally and permanently disabled within the definition of the words. I don't think he was carrying on continuously although he worked three-fourths of the time the last eleven or twelve years. He was not carrying on continuously, he was incapacitated part of the time. I, as a matter of fact, was incapacitated part of the time, due to colds that would occasionally take me away from the office, but do not consider myself totally and permanently disabled, because I am not in the office all of the time. If you were continuously complaining that your eyes hurt every time you attempted to use them, I would say that you were totally and permanently disabled, if you couldn't sit in the court room day after day, month after month because of headaches or your eyes bothered you, even though you could try cases in the court room three-fourths of the time. That is my conception of the definition given."

At the conclusion of the testimony, the motion of defendant for a directed verdict in its favor was granted by the court. This action is assigned as error, and presents the only question in the case.

[■] The rule which the Supreme Court has formulated for the guidance of the courts when this question is presented is laid down in Slocum v. New York Life Insurance Co.,

228 U. S. 364, 369, 33 S. Ct. 523, 525, 57 L. Ed. 879, Ann. Cas. 1914D, 1029, and is as follows: " * * * When, on the trial of the issues of fact in an action at law before a Federal court and a jury, the evidence, with all the inferences that justifiably could be drawn from it, does not constitute a sufficient basis for a verdict for the plaintiff or the defendant, as the case may be, so that such a verdict, if returned, would have to be set aside, the court may and should direct a verdict for the other party."

This case is followed in Gunning v. Cooley, 281 U. S. 90, 93, 50 S. Ct. 231, 74 L. Ed. 720.

The rule in the federal courts is that there must be more than a scintilla of evidence to entitle a case to go to a jury. U. S. v. Lyle et al. (C. C. A.) 54 F.(2d) 357, 358. A case cannot be submitted to a jury upon speculation or mere probabilities. U. S. v. Crume (C. C. A.) 54 F.(2d) 556, 558.

Appellee, upon oral argument, cited the case of U. S. v. Hammons (C. C. A.) 66 F.(2d) 912, which is analogous to the instant case. Hammons was severely wounded in action, suffering the loss of an eye, the hearing of one ear, and injury to the left leg. In the opinion of an expert witness, the plaintiff in that case was totally and permanently disabled at the time he left the service. There was further evidence that arthritis had attacked the left leg as a result of the wound received in action. It appeared that Hammons had worked as an automobile salesman from 1919 until 1927 and received considerable sums of money for such services, but that since that time he had been unable to do any work. It also appeared that his earnings were irregular, being considerably more in some years than in others. The judgment of the lower court was reversed upon the ground that the work record of the insured conclusively refuted the idea of total and permanent disability during the term of such employment.

The work record in the instant case brings it within the rule of the Hammons Case. There is here a substantial work record, for in the more recent years plaintiff has been almost continually engaged in gainful occupations. He left one gasoline service station to avoid attachment by creditors; his interest in the Allen partnership he sold in order to make a trip to California; he broke relations with the Continental Oil Company because of a cut in commissions; and at the time of trial he was engaged by another oil company. In none of these instances does the testimony show that he was compelled on account of his health to cease to carry on continuously a gainful occupation.

The testimony produced at the trial does not bring the condition of plaintiff within the definition of total and permanent disability. The testimony of plaintiff's wife was to the effect that by reason of the plaintiff's condition he was unable to work about one-quarter of the time. From this and other testimony the eye and ear specialist as an expert pronounces him totally and permanently disabled; however, he makes himself quite clear when he explains that, if a man is incapacitated for one-quarter of the time, although for the remaining three-quarters of the time he can follow his employment as continuously and efficiently as any other person, he is still totally and permanently disabled. Courts have gone far in sustaining these cases, but we do not think that any court should give this extreme construction to the statute. The court in United States v. McGrory (C. C. A.) 63 F.(2d) 697, 699, in apt language negatives such a holding: " * * * A reasonably continuous employment over several years, subject to only such interruptions as may be due to the nature of the employment or illness, such as a normal person might be subject to, *or even interruptions due to a partial disability,* does not constitute permanent total disability." (Italics ours.)

We do not minimize the pain and suffering to which the appellant is and has been subjected but, in view of the work record, it cannot be said that he is totally and permanently disabled according to the interpretation of the statute as applied by the courts. U. S. v. Martin (C. C. A.) 54 F.(2d) 554, 555; U. S. v. Rice (C. C. A.) 47 F.(2d) 749, 750.

" * * * He may have worked under difficulties, but there is no sufficient showing that he was unable to do what he did do." U. S. v. Hainer (C. C. A.) 61 F.(2d) 581, 583.

Judgment affirmed.